Thank you, Your Honors. My name is Robert Berry. I'm a Deputy Attorney General for the state of Idaho, and I thank you for considering this case today. And my initial argument goes to what has been discussed quite a bit by the Oregon matter. It goes to mootness. Given the decision by the Supreme Court, it seems like this matter is now moot. And appellees... Can I ask you about that, though? Because you said that in your brief, and it strikes me that it's not now moot. I mean, we've got the SIR reply, and we'll hear from Reclaim Idaho. I mean, they seem to concede that there's probably... I appreciate their candor. It does seem very difficult to see how there's actually an opportunity to provide relief here. But that doesn't mean that it's moot right now. Because, I mean, as I read the case slide, it doesn't become moot, at least until the date's passed for it to get on the ballot. So what do we do in the meantime? I mean... So I think you have to look at it two ways. I mean, if the response had been that it's not moot, then I think you would say, okay, let's look at the merits there. But where they've agreed that it's moot, to me, that's a different scenario. So basically, they conceded that they're now done, and that their initiative efforts will probably go to the next initiative cycle. But for now, it's moot. Well, if... Let's say that... I mean, I'm not sure I agree with you. I guess the question is... Because mootness is an Article III issue. And so when could it become moot? It's August 26th, I think, that the signatures have to be submitted. If the signatures are not submitted by that deadline, would that make it moot? Or would you still say there's still some possibility, I don't know, that they could figure out a way to get onto the ballot by September 7th? And that's the big issue, is the September 7th deadline. Well, but that's my question, is can it become moot before then? If they don't submit... So this is different. In the Oregon case, they've complied with what the district court said. Yes. The injunction. That, at least to my knowledge, has not yet happened here. And if it doesn't happen by August 26th, it may or may not. I don't know. We'll hear from Proclaim Idaho. But if it doesn't happen by August 26th, on August 27th, would the case become moot because the signatures hadn't been submitted by that date? Well, from a practical standpoint, that's really struggling with this case. How can we verify these signatures in a process in which they've never been... Well, that's a separate issue. If they submitted enough, and then you had to verify them, that's a separate issue. But say they don't even meet the threshold. I don't remember. Say they don't even meet the threshold on August 26th. Would the case become moot at that point? Yes, I believe so. Well, and then more fundamentally, if everyone agreed, it seems like, and again, we want to hear from Proclaim Idaho, but if both parties do agree that this case, at least the injunction part of it, is sort of done, would you consider a voluntary dismissal of the appeal? Would the Attorney General consider a voluntary dismissal? If that were to happen, it would also have to affect the district court's orders below. Those would have to be basically lifted or altered. I think that's the appropriate measure. So, I guess let me... So, it seems from what we have in front of us that you think it could be moot by September 7th, or, you know, September 7th's your day, and your opponent seems to indicate that in the SIR reply as well. The question is, why not mutually dismiss the act before the district court? Because that opportunity has not been presented. Okay. We'll ask Ms. Ferguson that in a little bit. I mean, it... In the meantime, if I could... Go ahead. I'm sorry. I guess, but if no dismissal, I guess, happens or would happen, then I guess we would have to determine whether any of the mootness exceptions applies, and that would be the capable repetition and evading review. And so, can you give me your thoughts on that? Yes, and thank you for that question, because it did come up quite a bit, it seems like, in the Oregon case. At this point in time, on the capacity for repetition, I think we have to look at what the record is. So, either in the supplemental excerpts or the R excerpts. And that has not been shown that it will be capable of repetition. Well, let me ask you, I guess, this way, because we were discussing this before, you know, in terms of, you know, the current pandemic. I mean, we can make some assumptions, and let's make some assumptions. But it looks like the pandemic is still going. And so, under the current law, I'm just trying to figure out, is it possible or reasonable to believe that Reclaim Idaho could successfully gather the required signatures to place the initiative on the ballot in, I guess, it would be 2022 of November. If they can only do that in person, it seems like there's a lot of the current, you know, pandemic. And not so much, will there be another pandemic, in my view, but whether or not this is going to end, and in what way it will end, and how soon it will end. Because right now, the requirements are pretty strict here. I don't mean to even say legally strict, but there's no other method of getting signatures that were in person, is correct? Correct. So, can you answer that question? All I can say is that I think we're all having to make really difficult choices. We're having to make choices in our kids back to elementary school, and we're going to make those choices. But, nevertheless, I mean, what our constitution provides for in Idaho is it provides some mechanisms for how these initiative processes are done, and it provides for in-person signatures. So, you know, there was a recent Sixth Circuit decision that came out, I think, on August 3rd, where it basically said, okay, there is a pandemic, but, you know, you still have to do in-person signature requirements. So, it's difficult, yes, but I don't think it violates any first amendment issues here. Okay. But I think what Judge McGee is asking is, I mean, what is the standard that we look to in the future? We don't, I mean, I don't think anybody we don't know. We're just getting notices of what schools are going back, you know, two weeks from now. So, we don't know what's going to be, I don't think anyone would suggest that they know what's going to happen in June of, you know, 2022. So, what do we do with that? Do we say, well, it's possible, so, therefore, it, you know, it might come back again, or do we say this is so and then see what happens? And if it turns out to be a problem, you know, they could file another lawsuit, maybe earlier this time, you know, get ahead of it. What's your view on that? So, it's the latter suggestion that you mentioned. So, again, they get 18 months under Idaho law to get the initiatives approved. And so, I think it becomes part of the legislative process this fall, or sorry, yeah, this winter. So, I think it's up to the legislature to figure out how to deal with this pandemic and if they want to alter how Idaho's initiative process works. Well, assuming that this is going to come up again, let me, sorry, I did, but this just came up because one of the things they complained about in their underlying case is that they got the runaround from the Attorney General's office and from the state of Idaho. That, you know, they sort of said, hey, can you do anything for us? And the governor said, no, we can't, but, you know, maybe the Secretary of State can. And then the Secretary of State said, no, we can't do anything, the Attorney General, or the governor can do it. What, that is problematic. I mean, if that keeps going on, what assurances do they have in 2022? Say the pandemic does go on, or at least into some portion of the collection process, what assurances does Reclaim Idaho have that they know who to talk to to get relief? Is your position that it's only the legislature, that there's no executive action? Well, no, no, I think you need to look at the records here. They never communicated directly to either the governor or the Secretary of State. It was to a staff, and it was on one day, on March 16th. So I think if you look- Well, but the response that they got was that the governor can't do anything. And then the Secretary of State said they can't do anything. Now, whether that came from a staff or from the governor, I mean, is that Idaho's position, that there are no exceptions at all that are available on an executive basis, and it only has to come from the legislature? Well, I think when you look at everything that was done, and you, I mean- Well, I'm just, look, admittedly, I don't know how relevant it is to where we're at today, but if we're all starting to focus on 2022, I'm just trying to figure out a way that this can go a little more smoothly. And if Reclaim Idaho's going to come, I mean, it is what it is. If they're going to get their run around, they're going to file another lawsuit or whatever. But I don't hear an answer from you about whether executive action is even possible in 2022, if something happens. So when you look at the absentee ballots or the mail-in ballots that were used in the primary, I mean, that was under existing statutory provision. And so what they've suggested, which is this electronic signature, that's not in statute. It's still, I mean, as we've pointed out in our briefing, there's still issues with it. And so- Let's follow up, if I can, on what Judge Nelson was saying, because that was going to be a separate question for me under the merits, but it seems like the governor suspended five statutes by executive order and empowered the Secretary of State and others he thought were necessary during the pandemic. So why wouldn't it be possible to make that kind of an executive order here between now and then? Sorry. And why wasn't- I guess there's two reasons for my question on that. I mean, why doesn't that show that that was not narrowly tailored or that there was a compelling state interest that they couldn't have narrowly tailored? The governor did it in five other instances, but for whatever reason, chose not to do that. Well, I guess there's a couple of answers to that. One, looking at the facts of this particular case, I mean, what the governor did, it didn't matter. They submitted their efforts on March 18th, which is a week before the stay-at-home orders were issued. So, and if you look at the declarations that were all submitted, none of the volunteers that they relied upon wanted to continue to do those efforts. So, I guess looking at this particular case, I think there's differing facts. Moving into the future, I can't speculate. I'm just an attorney. Well, I don't think we're asking you to speculate. We're trying to get an understanding of whether the representations that were made that the governor has no authority, if that's the attorney general's position. Because if that's the position, then I think, the one thing we can do is if we're going to go forward to 2022, we can start to have a little bit more of an organized process. And it'd be good to start getting some understandings in place. Because I think what's happening here is you've got district courts trying to decide these cases on the fly with, you know, they're doing the best that they can. And it'd be better to get some of this understanding out of the way. And if the governor's position continues to be, he has no executive authority, then that needs to be understood. I mean, we're not asking you to speculate on what the governor would do. But you are authorized to speak on behalf of the state of Idaho on how those statutes could be interpreted. And do you think that the governor has authority to issue? Well, let me ask it this way. Was there ever an attorney general opinion that the governor was relying on when he said he didn't have authority to extend the deadlines? No, I'm not aware of that. Well, then maybe you don't have a position. Well, also, the in-person requirement is not in the Idaho Constitution, if I'm correct. The minimum percentage is the constitutional requirement. And I don't think Reclaim Idaho is challenging that. So I guess, you know, again, this was also, if we were going to get into the merits, I'm just trying to figure out how the governor, you know, used his executive power to suspend nine other Idaho election statutes because of the pandemic, extending five election deadlines and decreeing by executive order that only mail-in voting would take place in the primaries. And not only that, he also delegated to the secretary of state the authority to suspend any other statutes that the secretary deemed necessary. So I'm just trying to figure out, again, this was going to the merits, but it seems also relevant here. Why does the governor have the power to do that, but not to allow for electronic signature gathering in this case? If I may, can I do a two-fold response? Sure, of course. So I think there's, as Judge Nelson stated, I mean, we're trying, I think people are trying to do this on the fly and they're trying to make the best decisions during the pandemic. And so I imagine that is what the governor was trying to do back in the spring. But the issue now moving forward, because we're now on August 13th, is again, I mean, under our constitution, it's the legislature that governs the procedure for these initiatives. So I think now that, you know, perhaps issues that have been raised... Well, Ken, I don't mean to cut you off, but I don't really think you're answering Judge McGee's question. And maybe the way to leave it this way is let me make a kind recommendation that in preparation for 2022, you might want to get Attorney General Wosden involved and think through these issues in the Attorney General's office a little more carefully, because I don't think we're getting an answer to whether the governor has authority. And that seems to be a pretty fundamental question. Maybe that was being decided on the fly before, but that's going to be a pretty weak argument if you come back, and this case comes back in 2022. If I can make another point, since there's some recommendations being suggested to me by Nelson. Yeah, there seems to have been a lot of evidence on the record that electronic signature gathering is just as safe, if not safer, than the in-person signature gathering. And also, the DocuSign process that Reclaim Idaho is suggesting would provide county clerks with all the same verifying information they need, except for the wet signature. And this DocuSign process, I believe, is the same electronic signature process that the state uses to register voters. So I'm trying to figure out, at least there was some reference to that in the record, so I'm trying to figure out why that can't be narrowly tailored. I mean, we're looking at this, and I still don't have an answer for that. Maybe you can provide one here today. Yeah, if you look at the supplemental declaration of Jason Hancock, he talked about the differences. And in it, he basically says when they did this electronic registration back last but they also still used a wet signature. So that is what the state process is, and that's how the county clerks verify. And it's still unclear to me how DocuSign will actually work, and all that we're getting is just perhaps names and addresses. So you can't verify. So it's problematic. Especially to do it on the fly. I'm not quite sure. Well, I didn't see the evidence that way, but I understand that. I'm just not sure it's unreasonable for individuals to risk getting a disease like COVID-19 or risk their lives for in-person signatures when there are other reasonable alternatives. And in my view, at least, there's been no real answer to that as to why, you know, the measures that the state could take and haven't taken. And I think that the Reclaim Idaho folks said they would be willing on the verification process to give some Social Security number information. So I'm just not quite sure why we're putting people through this process or why Idaho is choosing to do that. When there are other reasonable and more narrowly tailored options available. All right. Counselor, you've well exceeded your time. We've helped you along. We'll give you a couple of minutes for rebuttal if needed. All right. We'll hear now from Reclaim Idaho. Good morning. I'm Deborah Ferguson, Counselor on behalf of Reclaim Idaho. And Reclaim Idaho was seeking the opportunity to get its educational funding initiative on the ballot. As you see from our briefing, this is an all-volunteer force, kind of extraordinary in and of itself. They showed excellent diligence to accomplish this. Idaho has some of the most rigid and strict initiative requirements in the country. And they were well on their way to putting it on the ballot. I think we had the law, and I'm referring to the Engel case, and I think the facts on our side. But as it really stopped dead in our tracks with the Supreme Court's stay. And quite simply, it's a matter of just, we have the law and the facts, but we've run out of time. I'd echo what is said in the dissent of Justice Sotomayor. Considering the sweeping scope of the Supreme Court stay, that isn't just until there's a file a petition for cert, and go all the way through that time frame. And then even beyond that, until the Supreme Court made a determination of the petition for cert. We don't see any realistic path forward that could allow... Or 2020, you're saying. Yes, Your Honor, that's correct. So if you think that this case, and I understand for all the reasons that you said, that this case is moot, and Mr. Berry seems to indicate that it will be moot, why not mutually dismiss this appeal and the action before the district court? Well, this is Mr. Berry's appeal that he's filed on behalf of the Attorney General's office, and they have made no indication that they were willing to dismiss the appeal. Certainly, if it were my appeal, I would dismiss it, but I'm here... Well, I think what we just heard from Mr. Berry, and not to turn this into a mediation conference, but what we just heard was, and I think it's a fair point, that part of that depends on what would happen in the district court. Would you be willing to, and you don't have to answer this if you want to take it under advisement, but would you be willing to dismiss the complaint in conjunction with the dismissal of the appeal? And perhaps, I don't know, moot out the... Agree that the district court decision has no precedential value as moot. If you were able to wrap that all up, would you be willing to go along with that? Well, I would certainly... That would be a long, thoughtful discussion we would have with Reclaim Idaho. And so, I guess, otherwise, I'd like your view on mootness, because I think even the parties may both agree that it's moot. We have to make that determination and look at all of the exceptions, and here, the exception that we've been talking about in this and the other cases, the capable of repetition and evading review. And so, can I get your thoughts on that? Well, as the court has discussed already at length, the standard there is a reasonable expectation of both those standards. And I can't say that we have a reasonable expectation, that it would not be capable of repetition or would evade review. So, if Reclaim were to bring a similar initiative that would occur in two years in the 2022 election, they would have 18 months to begin the process over. So, I don't feel that we could say that we have reasonable expectations of both those things occurring. So, you think it is capable of repetition and evading review? I don't think it's the opposite. Yeah. But I do. I mean, because I don't think we can say that we have a reasonable expectation. It is. These are really uncertain times, and we don't know that. And these initiatives, too, are so, it's very fact-specific. And whether this is going to recur again in two years, I can't say. Well, if we were to just dismiss, I mean, we've got the voluntary dismissal, which might wrap everything up. But if that doesn't happen, and we were just to dismiss the appeal as to the injunction is moved, do you see value in pursuing the declaratory judgment in district court? Or is your position, look, we're focused on 2022. We'll come back to the but this case as it is, is done. Yeah. And you're right, Your Honor. I mean, we also pled in addition to the injunction for a declaratory judgment. But our declaratory judgment was based on an as-applied challenge. Again, you know, under these facts and circumstances, which I don't, so I would, again, have to have more discussions with my client to have authority to make any representations. Well, I think the risk, as you point, I think where you're headed with this is that when it's a declaratory judgment on an as-applied challenge, the risk is it starts to look like an advisory opinion. Because what, I mean, what is that going to look like? He can't provide, the district court can't provide relief for 2020. So if he provides a declaratory judgment, I mean, what's he going to say? You know, you could start at a very high level of generality, but we don't know what the situations are going to be in 2022. You may be able to meet it if you start, I mean, here, I'm not trying to, you know, suggest that there wasn't diligence, but let, you know, I think by all accounts, there certainly can be more diligence on behalf of Reclaim Idaho for 2022. And now that they have a heads up that life is uncertain, if they started out 18 months ahead of time instead of six months ahead of time, it seems like they might be in a very different position come June of 2022 regardless. Well, and I, you know, and I don't know that that's true. I don't think that the reason that they started when they did last fall was lack of organization or diligence. It's, there's a very different dynamic and this is in the record in our declarations for volunteers. And so it's one thing if you're having paid signature gatherers, like 99% of the initiatives in the country, but here it's quite unique with volunteers and they're very motivated by a deadline. And if you are trying to motivate people as individuals and humans that, and they're, they see the value in what they're doing and there is a deadline, it's quite clear that that works far more than just stretching it out over a long period of time. So, but I do think that with a declaratory judgment, again, I get back to the fact, I don't, I prefer, I wish I didn't have to agree with you on this point, but in candor. Well, you don't have to. I'm not always right. It's an applied challenge. You know, we weren't, it wasn't a facial challenge to these statutes and it's difficult to imagine how to get that declaratory judgment on an applied challenge that's unique to these circumstances. Well, I certainly appreciate your candor. I mean, that's, uh, it's a hard. So does that mean the parties would be willing to agree to a joint dismissal of the appeal? And your honor, you're asking would reclaim, do I believe reclaim would be willing to agree to a joint dismissal of the appeal? I, um, I haven't spoken to my client, but I would such a move. Yes. I just, I just even, um, cause we have to determine movements on our own and I've just been struggling with this. This is the reason for the questions that I've been asking all of the lawyers up to this point regarding the capable repetition and avoid, um, of any review, but it is whether or not even under as applied challenge, um, you know, there's, there's an issue here on just a lot of unknown. There's a lot of speculation that would have to take on both sides, it seems. Um, but I'm just somewhat concerned and I don't know if we have enough facts before us that the conditions that make this, uh, as, as applied are ongoing and could last, you know, until at least 2021. And what effect does that have? And I guess those are issues that we have to have to sort out if there's not a dismissal, um, uh, joint dismissal. So, um, we'll, we'll have to see. I don't know if you have anything else that you want to add to that. You know, I think the other prong of, uh, whether it would be evading review, it seems that, uh, there would be another opportunity, uh, to bring a suit with more time, um, leading up to it. Although if the Supreme court were to weigh in with such a heavy hand again, it wouldn't make much difference how much time we had. Uh, I didn't throw on this in, in this, you did not bring a challenge under the Idaho constitution. And as I was reading this, I was wondering if there would be, um, uh, if it might be a different outcome under the Idaho constitution, as I read, as I read the, you know, the Supreme court precedent on this, there's a huge hesitancy to get involved under, you know, have the federal courts getting involved in state court processes, uh, and where Idaho has such a strong history of the ballot initiative process. I just wonder whether the first amendment in Idaho would, would have changed that analysis. And I don't know if you have any thoughts on that. It's not really particularly relevant, but I'm just sort of interested in whether that analysis would be different under the Idaho state constitution, as opposed to the first amendment. That's that's worthy of courts getting involved late in an election pointedly. Um, and so the question that was questioned here, I guess, was this, you know, soon enough. Um, and, uh, but I'm not sure if, uh, if you, you have a thought on that, Ms. Ferguson, it looks like the district court here ruled, you know, uh, not on what I would consider the E, but some, some time in advance, what was the date that the district court issued its order? Um, I believe they issued the order on the, um, um, maybe the, perhaps it was the 22nd of June. Um, yeah, I'm, I'm thinking the date we state then took 10 days to respond and the court took it up immediately. So it was very, a very expedited process. You know, I, part of with the, um, the state's emergency application to the Supreme court, you know, we certainly were aware of the other cases that are found in justice Sotomayor's footnote in her dissent. Um, and it was certainly hopeful that reclaim because it was not a matter of voting and it wasn't on the Eve of an election, you know, Eve typically meaning the night before here, um, this was far more attenuated. And I think, uh, we, and we tried very much to, uh, draw that to the court's attention, that distinction that this was a, this is a ballot initiative. It's only about the opportunity to collect the signatures to complete collecting them. And, uh, the election at that point was, you know, four or five months away. So it seems like, uh, we've had, it, it, it's quite a bit different than some of the cases. The Supreme court has looked at where the elections were, were imminent. Um, but, uh, unfortunately, uh, the Supreme court for my client didn't, didn't recognize that distinction. Anything else, Ms. Ferguson? No, Your Honor. All right. Two minutes for rebuttal. And thank you for that. I, I will be very brief. I apologize for taking too much time in the um, I, I would just say that, you know, the, these election deadlines, um, they're rolling. And so, you know, they started April 30th, May 1st, then July. Um, and then we've got about two, um, so, so really the ongoing process that the state has Thank you for your time today. Thank you. Thank you to both counsel for your helpful arguments in this challenging case. The cases, the case just argued is submitted for decision by the court that completes our calendar for the day. And for the week we are adjourned.
judges: Rawlinson, Murguia, Nelson